THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ROBERT GEORGE, Defendant-Appellant.

First District (2nd Division)    No. 1—90—2005

Opinion filed August 17, 1993.—Rehearing denied September 29, 1993.

Michael J. Pelletier and Debra R. Salinger, both of State Appellate Defender's Office, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Susan Schierl, and Matthew L. Moodhe, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE McCORMICK delivered the opinion of the court:

Following a bench trial, defendant Robert George was found guilty of murder and sentenced to 20 years' imprisonment. On appeal, defendant contends that (1) he did not waive his right to a jury trial; (2) the State failed to prove beyond a reasonable doubt that he was accountable for the murder; (3) the trial court considered improper evidence against him; (4) the simultaneous joint jury and severed bench trial with three codefendants denied defendant a fair trial; and (5) the trial court improperly failed to hold a hearing on defendant's fitness to stand trial. We affirm the judgment of the trial court.

I

On September 20, 1988, defendant requested severance of his trial from the trials of codefendants Thomas Basden and Shawn Downey. The trial court granted the motion. On May 8, 1989, counsel for codefendant Michael George, defendant's cousin, moved for severance from Basden and Downey. With defendant present in court, the prosecutor noted that because counsel for defendant and Michael George had indicated that they sought bench trials, the jury trial of Basden and Downey could proceed together with the bench trial of the Georges. Counsel for Michael George answered that the possibility of a bench trial had no bearing on the severance motion:

"If we indicate a bench [and] on that morning [of trial], my client wishes a jury, we have to bring up a double jury ***. [I]f the posture changes, we'll let you know."

The court granted the severance and asked about scheduling the trial. The four attorneys agreed to a single tentative trial date for all defendants. Michael George's counsel said he anticipated a bench trial, and defendant's attorney said, "[s]ame for Robert George, ma'am, bench trial at this time."

The four defendants later moved for substitution of judge. At the hearing on the motion, with defendant present in court, defendant's attorney said:

"There are two lawyers who have opted not to take juries and were opting for a bench trial and Judge Morgan would have to rule directly on the evidence in those cases."

The court denied the motion for substitution. Defendant said nothing.

At the beginning of jury selection, the trial court excused defendant from the courtroom. The next day defendant moved for severance from Michael George. The trial court said, "[I]t seems to me since these are bench trials anyway, I don't have any problems with the severance." Neither defendant nor his counsel objected to the trial court's assertion that defendant would have a bench trial.

Following a recess and before bringing the jury into court, the trial court requested opening statements for "the bench people." Defendant's attorney then made a brief opening statement to the trial court. The trial court brought in the jury and said: "[T]here [are] two other defendants whose cases you will not be hearing. Their cases are being heard by the court." The trial court permitted counsel for the Georges to introduce themselves and their clients to the jury.

Defendant contends that he did not validly waive his right to a jury trial because the trial court never expressly informed him of his right to jury trial, and defendant never stated on the record that he waived his right to a jury trial.

"[A] jury waiver, to be valid, must be knowingly and understandingly made. [Citations.] That determination cannot rest on any precise formula and necessarily turns on the facts and circumstances of each particular case. [Citations.] Recognizing that the accused typically speaks and acts through his attorney, we have given effect to jury waivers made by defense counsel in defendant's presence where defendant gave no indication of any objection to the court hearing the case. *** We have not required that the record affirmatively establish that the court advised defendant of his right to a jury trial and elicited his waiver of that right [citation], nor that the court or counsel advised defendant of the consequences of the waiver." *People v. Frey* (1984), 103 Ill. 2d 327, 332, 469 N.E.2d 195.

■ Here, defendant's counsel stated in open court that defendant, like Michael George, was indicating a bench trial as of May 1989, almost a year before the trial actually began, but after the trial court granted defendant's motion for severance from Basden and Downey.

The waiver at the May 1989 hearing was somewhat equivocal because defendant's attorney qualified the waiver with the phrase, "at this time." The attorney adopted the position of Michael George's counsel, who said that he anticipated a bench trial, and if the posture changed, he would inform the trial court. Neither Michael George nor Robert George ever informed the trial court of any change in the posture of their cases. Defendant failed to inform the trial court of any change in his position on the morning of trial, when the trial court again asserted that the Georges were to have bench trials, while a jury was to hear the trial of Basden and Downey. Before bringing codefendants' jury into the courtroom, the trial court requested opening statements for "the bench people." Defendant's attorney complied with this request and made an opening statement to the trial court outside the presence of the jury. Neither defendant nor his counsel objected at any time, either before or during trial, to a bench trial for defendant while Basden and Downey had a jury trial.

It is indeed insufferable to allow defendant to knowingly participate in a bench trial without protest or demand for a jury trial with a view that if an adverse judgment is rendered, he would be granted a new trial because of the absence of an affirmative waiver of his right to a jury trial. From the facts and circumstances of this case, we infer that defendant understood his right to a trial by jury and he knowingly waived that right. See *Frey*, 103 Ill. 2d at 332.

## II

Defendant next argues that the evidence does not prove beyond a reasonable doubt that he is guilty of murder. Defendant does not dispute evidence that on February 29, 1988, he drove a car into an alley near 39th Street and St. Louis Avenue. Basden and Downey, passengers in the car, fired shots down the alley where some boys were playing basketball. A bullet from Basden's gun killed Juan Madrigal. Defendant argues that the evidence does not show that he knew Basden had a gun or that he intended to shoot, so defendant cannot be held accountable for Basden's acts.

James Pelikan, nicknamed "Jimbo," testified that on February 28, 1988, the day before the shooting, he discovered on his garage, in the alley near 39th Street and St. Louis Avenue, graffiti stating: "Jimbo and Frank dies, [Satan] Disciples, 36th and Rockwell, Two-

Six Killer \*\*\* Godfather and Player." Pelikan, who was a lieutenant in a street gang called the Two-Six, has a brother named Frank. He knew that Michael George had the nickname "Godfather," and defendant was called "Player." Since 1982, Pelikan had disagreements with the Georges because they belonged to the Satan Disciples, a rival gang. Pelikan admitted that he did not see anyone put the graffiti on the garage, so he did not know exactly when it was done. Pelikan was standing near Madrigal, watching the basketball game in the alley, when defendant drove into the alley and Basden shot Madrigal.

On direct examination, Pelikan said that the car from which the fatal shot was fired "pulled up" at the intersection in the alley. On cross-examination, he assented when defense counsel asked: "[A] car slowed down and some shots were fired. Is that correct?"

Joe Gutierrez testified that after school on February 29, 1988, he and about 10 of his friends saw defendant and three others walking towards them as they were walking from their high school. Several of the persons with Gutierrez were members of the Two-Six. Defendant made gang hand signals for the Satan Disciples and signals to put down the Two-Six. Defendant pulled out a gun from up his pants far enough so that Gutierrez could see the handle. Defendant put his hand out front, which Gutierrez interpreted to mean "[l]ater on," but he admitted the gesture could have meant "stay back." Gutierrez and his friends went to the alley behind 39th and St. Louis and played basketball. He said that the car defendant drove stopped in the alley before the shots were fired.

Ricky Cataldo, who was 14 in 1988, testified that on February 29, 1988, he went with Downey, Basden and the Georges to Basden's home to pick up Basden's father's car. Cataldo saw the other four talking, but they fell silent and all got into the car when Cataldo approached them. Defendant sat in the front passenger seat and Michael George sat behind him. Cataldo sat in back, between Downey and Michael George. No one in the car discussed guns or the Two-Six gang. Basden "drove to Rockwell, took Rockwell to 38th Street, 38th Street up to St. Louis and St. Louis to 39th," and then he drove to Downey's home on 35th Place. Downey went into his house and returned to the car moments later.

Cataldo testified that Basden drove back to the area of 39th and St. Louis, where he stopped to change places with defendant while Downey switched with Michael George. Defendant drove into the alley while Basden and Downey rolled down the windows on the passenger side of the car. Defendant turned at the T-intersection in the alley and stopped for a few seconds while Basden and Downey

fired. Defendant did not tell either Basden or Downey to roll down their windows or fire their guns. Cataldo said defendant drove a few blocks and changed places with Basden again. Basden drove to a K mart parking lot at 51st and Kedzie, where defendant and Michael George took the guns and left the car.

■ We find that the trial court properly held defendant accountable for Basden's acts.

> "In order to establish the defendant's legal accountability for the offense ***, the State must prove beyond a reasonable doubt that the accused solicited, aided, abetted, agreed or attempted to aid another person in the planning or commission of the offense, that such participation occurred either before or during the perpetration of the crime, and that this participation was with the concurrent, specific intent to promote or facilitate the commission of the offense. [Citations.] While mere presence at the scene of the crime is insufficient to establish legal accountability for commission of the offense, one may aid or abet without actively participating in the overt act. [Citations.] Words of agreement are not necessary to demonstrate a common purpose to perpetrate a crime, since the common design can be inferred from the circumstances surrounding the commission of the unlawful act. [Citations.] Although it is true that legal accountability for a crime is based on the defendant's assistance before or during the commission of the criminal act, the defendant's conduct subsequent to the offense may raise an inference of prior or concurrent participation. [Citations.]
>
> While mere presence at the scene of the crime is not culpable and knowledge by the defendant that a crime was being committed does not constitute aiding or abetting [citations], proof that the accused was present during the commission of a crime without opposing or disapproving it, that she maintained a close affiliation with her companions after the perpetration of the offense and that she failed to report the crime are all factors which the trier of fact may consider in determining the defendant's legal accountability." *People v. Grice* (1980), 87 Ill. App. 3d 718, 724-25, 410 N.E.2d 209.

Here, defendant argues that the record contains no evidence that he knew Basden and Downey had guns or that they intended to shoot when he slowed down at the intersection in the alley. Cataldo testified that defendant switched places with Basden; Basden could more readily shoot because he was no longer driving. The witnesses testified that defendant did not merely slow down, he stopped after turning at the T-intersection in the alley with Basden's side of the car facing the crowd in the alley. When defendant got out of the car,

he took the gun from Basden and disposed of it, ostensibly to help Basden escape detection. Thus, defendant's acts aided Basden and those acts support the inference that defendant intended to facilitate the offense. The graffiti on Pelikan's garage, as well as Gutierrez's account of the encounter with defendant earlier on the day of the shooting, further supports the finding that defendant specifically intended to facilitate commission of the crime. The record adequately supports the trial court's finding that defendant was accountable for Basden's acts.

### III

Defendant next argues that the trial court considered evidence not admissible against him in determining his guilt.

Basden's statement was not admitted into evidence against defendant, but the trial court heard the assistant State's Attorney read the statement into evidence against Basden and Downey in the jury trial which the trial court conducted simultaneously with defendant's bench trial. Although Basden's statement is not included in the record on appeal in this case, it is in the record for *People v. Basden*, docket No. 1—90—1335. In that statement, Basden said that when he first drove around 39th and St. Louis, he saw a group playing basketball in the alley, so he drove into the alley to get a closer look. When he saw members of the Two-Six in the crowd, he drove to Downey's house, where Downey picked up a gun. He then drove back to the area of 39th and St. Louis, where he and Downey changed places with the Georges, before defendant drove the car on its second pass through the alley. No witness and no evidence included in the record against defendant indicated that defendant and codefendants went into the alley the first time they went to the area of 39th and St. Louis, before they switched places in the car. No evidence admitted against defendant shows that the car made two passes through the alley.

Throughout trial, the trial court indicated that it was carefully keeping track of which evidence had been admitted against each defendant. After all parties rested in the bench trials, the trial court decided to delay ruling on the cases to give it an opportunity to review the evidence specifically admitted against each defendant before ruling. A few days later, after hearing closing arguments, the trial court said:

> "[B]ased on the evidence, considered attributable to each of the Defendants separately, *** this Court has no doubt in its mind that Robert George knew what was going to go down ***.
> * * *

We do know that Juan Madrigal was shot and killed that night ***.

We do know that those shots came from Basden's car.

*** [W]e do know that Robert George was driving the car at the time those shots were fired ***.

* * *

*** I considered the evidence that the car drove by and the switching took place[. T]his is Tom Basden's car and he is driving as you would normally expect, unless there is some reason for him not to drive.

The evidence has shown that the gun[s] belonged to Basden and Downey, and this switching did take place and it did place those shooters on the side of the car that was going to be facing that crow[d] on *the next pass through that alley.*

*** [This court] infer[s] that some conversation had taken place at some point because *** [the defendants] did this specific switch [ ] to put the two shooters on the passenger side of the car.

*** [E]verybody knew where they were supposed to go.***

Robert was driving the car after he switched with Tom. Whether that car came to a full stop or merely slowed down, I think that that cannot be taken as anything other than facilitating the shots that were fired ***.

* * *

There is again a switching after the shooting where people resumed their prior positions and again, I *** infer *** the admission of the common purpose having been accomplished ***.

I do think *** that a conspiracy did exist. *** I certainly think it existed to the point where Michael asked for the guns out at K-Mart.

*** Michael George and Robert George were going to take the responsibility for getting rid of them.

*** [T]hose guns were not recovered.

*** [I]t would be unreasonable to assume that Michael and Robert were there not knowing what on earth was going on[,] not knowing that Basden had a gun ***." (Emphasis added.)

The trial court concluded that defendant was accountable for Basden's acts.

In a post-trial motion, Michael George's attorney objected to the conviction because the trial court based it on the car having taken two passes through the alley. Counsel noted that only Basden's statement showed two passes through the alley and that statement was not admissible in the bench trials. The trial court reaffirmed the conviction, briefly restating the evidence apart from the two passes through the alley which supported the finding of accountability.

Defendant now asserts that the conviction must be reversed because the trial court referred to two passes through the alley.

The trial court apparently based its assertion on Basden's statements to the police, and use of that evidence against defendant would violate the confrontation clause of the sixth amendment because Basden was not subject to cross-examination. (*People v. Dixon* (1988), 169 Ill. App. 3d 959, 967, 523 N.E.2d 1160.) The record contains no direct evidence that the four defendants saw a basketball game or members of the Two-Six the first time they drove in the area of 39th and St. Louis.

This court presumes that the trial court in a bench trial considered only competent evidence in reaching its verdict, but an affirmative showing that the trial court considered improper evidence will overcome the presumption. (*People v. Nuccio* (1969), 43 Ill. 2d 375, 396, 253 N.E.2d 353.) Where the court has considered such inadmissible evidence, even if the evidence violates a constitutional prohibition, this court should affirm the conviction if the error was harmless beyond a reasonable doubt. *People v. Schmitt* (1989), 131 Ill. 2d 128, 140, 545 N.E.2d 665.

■ In this case, we have a particularly strong indication that the trial court would have reached the same verdict if it had not considered the evidence of two passes through the alley against defendant. When counsel for Michael George pointed out to the trial court its erroneous assertion that there had been two passes through the alley, the trial court recounted the evidence properly admitted against the Georges and stated that that evidence formed the basis for its verdict. Since the properly admitted evidence upon which the trial court actually relied adequately supports the verdict, we find beyond a reasonable doubt that the erroneous consideration of evidence of two passes through the alley had no effect on the verdict.

IV

Defendant maintains that he did not receive a fair trial because the three separate trials of four defendants confused the trial court. Defendant points to two comments the trial court made to support his argument.

During trial, when counsel for Michael George moved to strike Gutierrez's testimony regarding the encounter with defendant on grounds that Gutierrez did not say Michael George was there, the trial court said:

"I am not going to strike the testimony. What you have to do is differentiate between what is admissible and what weight that testimony might be given at some future date given the totality of the circumstances.

I'm sure that one of the things that I think is happening is some confusion coming forth around the fact that we're doing things simultaneously. *** I don't think I can remember a trial recently where every witness who testified had to testify to something that was in the presence of the defendant. There are all kinds of background witnesses, circumstantial witnesses. ***

The witness relative to [Michael George] is quite another matter. And certainly I would in looking at that testimony at the end would certainly not overlook the fact that *** he never identified your defendant.

That's all part of weighing the evidence. I don't see any basis to strike the evidence."

Later, the State sought to elicit from Officer James Spratte testimony that Michael George's mother told him on the night of the shooting that she last saw Michael in Basden's car and that she told Spratte where Basden lived. Spratte said that he did not remember whether the woman at Michael George's home identified herself. The prosecutor asked what she said and all defense counsel objected. The trial court heard argument on the objections in chambers. The prosecutor and counsel for Michael George contradicted each other concerning evidence already presented, and the trial court said:

"Counsels, please. I realize that there are a lot of ins and outs of this case and everybody gets confused about what is or isn't [in evidence] at this point but I think given the fact that he cannot identify [the woman, the objection should be sustained.]" ·

Defendant argues that the trial court's comments show that the procedure of simultaneously conducting two severed bench trials of the Georges and a jury trial of the other two defendants was too complex, and that by using this procedure the trial court denied him a fair trial. Defendant did not object in the trial court to the simultaneous trials.

In *Schmitt*, the defendant argued on appeal that separate but simultaneous bench trials of him and a codefendant violated his right to a fair trial. Our supreme court held that that defendant "cannot claim error in the procedure employed by the court where he willingly participated without objection." (*Schmitt*, 131 Ill. 2d at 137.) · The court in *Schmitt* proceeded to consider and reject the argument on the merits. The court found that the trial court was capable of adequately compartmentalizing its consideration of the evidence, so the simultaneous trials in that case did not deny defendant a fair trial.

In this case, the trial court repeatedly indicated that evidence at trial was admissible against only some of the defendants, or that evidence had different weights against different defendants. Defen-

dant has not pointed to any error in the court's rulings on the evidence.

Defendant relies instead on two comments the trial court made in the course of trial concerning the complexity of the proceedings. The first occurred in the trial court's explanation of its ruling that evidence of the encounter between defendant and Gutierrez would be admissible against all defendants, and the second was an admonition to stop counsel from arguing with each other in chambers. Neither comment indicated that the simultaneous trials were overtaxing the trial court's ability to compartmentalize consideration of the evidence. The record as a whole does not show that the procedure of conducting simultaneous bench and jury trials was so complex that it effectively denied defendant a fair trial.

## V

Finally, defendant objects to the trial court's failure to hold a hearing on his fitness to stand trial.

At the sentencing hearing, the trial court observed that the presentence investigation revealed that after arrest and before trial, defendant shot himself in the head, cut his arms with a razor and took an overdose of pills in three unsuccessful suicide attempts. Defendant's attorney admitted that he was unaware of the incidents. The trial court ordered an examination to determine defendant's competence for sentencing.

Although the psychiatrist's report of the examination is not in the record, the trial court stated that according to that report, the psychiatrist found defendant fit for sentencing. The trial court sentenced defendant to the minimum term of 20 years' imprisonment.

Defendant contends that the trial court should have *sua sponte* conducted a separate hearing to determine whether defendant was fit to stand trial apart from the hearing on competence for sentencing.

"To require an accused to stand trial when he is unfit to do so constitutes a denial of due process. [Citations.] A defendant is unfit to stand trial if, because of a mental or physical condition, he is unable to understand the nature and purpose of the proceedings against him or to assist in his defense. [Citations.] Fitness speaks only to a person's ability to function within the context of trial; it does not refer to sanity or competence in other areas. A defendant can be fit for trial although his mind may be otherwise unsound. [Citation.] The mere fact that defendant suffers some mental disturbance or requires psychiatric treatment does not necessarily raise a *bona fide* doubt as to his ability to understand the nature and purpose of the proceedings against him or to assist in his defense. [Citations.] When a *bona fide* doubt

as to defendant's fitness to stand trial is raised, the court shall order that a determination of that question be made before further proceedings. [Citations.] The critical inquiry is, did the facts presented raise a *bona fide* doubt that defendant possessed the two qualities necessary to make him fit for trial. [Citations.] The initial determination of whether a *bona fide* doubt has been raised is a decision resting within the discretion of the trial court since it is in a better position to observe and evaluate defendant's conduct. [Citations.] Accordingly, the trial court's decision will not be disturbed on review unless there is a clear showing of an abuse of discretion." *People v. Bivins* (1981), 97 Ill. App. 3d 386, 388-89, 422 N.E.2d 1044.

Defendant claims that his three suicide attempts raised a *bona fide* doubt of his fitness for trial. In *People v. Lopez* (1991), 216 Ill. App. 3d 83, 576 N.E.2d 246, the trial court held no hearing on defendant's fitness to stand trial despite his suicide attempt and his history of mental illness, including several periods of hospitalization. The court found that the suicide attempt and hospitalizations did not create a *bona fide* doubt of defendant's fitness to stand trial.

In *People v. Jones* (1982), 109 Ill. App. 3d 120, 440 N.E.2d 261, the appellate court found that the trial court did not abuse its discretion although the court held no hearing on the fitness to stand trial of a defendant who had a substantial history of mental illness. The appellate court emphasized the trial court's ability to view the defendant and the fact that "[d]efense counsel, who would have been the first to know whether the defendant was unable to assist in his defense, never questioned the defendant's fitness." (*Jones*, 109 Ill. App. 3d at 130.) The appellate court also noted that "within a month after the defendant's conviction, he was again examined and found to be fit" for sentencing. *Jones*, 109 Ill. App. 3d at 130.

■ Defendant's attempted suicides do not, in and of themselves, raise a *bona fide* doubt of the defendant's fitness for trial, because the suicide attempt has no direct bearing on the issue of whether defendant can understand the charges and assist in preparing a defense. (*Lopez*, 216 Ill. App. 3d 83.) When defense counsel has neither indicated a problem in preparing a defense nor requested a fitness hearing, evidence of mental illness alone does not provide grounds for reversing a conviction. (*Jones*, 109 Ill. App. 3d 120.) Certainly, defendant's suicide attempts create a *bona fide* doubt of his sanity. However, defendant's behavior was not so severely aberrant as to raise a serious doubt of his ability to function within the context of trial. (*Cf. People v. Harris* (1983), 113 Ill. App. 3d 663, 447 N.E.2d 941.) The trial court saw no indication that defendant was unfit,

defense counsel never suggested that he had any difficulty in preparing a defense and a psychiatrist subsequently found him fit for sentencing. We find that the trial court did not abuse its discretion when it decided not to hold a post-trial hearing on defendant's fitness to stand trial.

For the reasons stated above, we affirm the judgment of the circuit court of Cook County.

Affirmed.

HARTMAN and SCARIANO, JJ., concur.