THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. POR-
FIRIO GUTTIEREZ, Defendant-Appellant.

First District (1st Division)    No. 1—91—2909

Opinion filed March 20, 1995.

Michael J. Pelletier and Karen Daniel, both of State Appellate
Defender's Office, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb and Gael A.
McCaughey-O'Brien, Assistant State's Attorneys, of counsel), for the People.

JUSTICE WOLFSON delivered the opinion of the court:
This State, as it must, provides adequate procedures to protect a
defendant's right not to be tried while unfit. In this first-degree mur-
der case, those procedures were ignored. For that reason, we reverse
the defendant's conviction and remand for a new trial.

PROCEEDINGS BEFORE TRIAL
The defendant was charged with first-degree murder and ag-
gravated battery. For reasons that are not clear, the trial judge
ordered a behavior clinic examination of the defendant. That exami-
nation is authorized by section 104—13(a) (725 ILCS 5/104—13(a)
(West 1992)) of the Code of Criminal Procedure of 1963 "[w]hen the
issue of fitness involves the defendant's mental condition."

Section 104—15(a) governs the contents of the report. According
to that section:

"[t]he report shall include:

(1) A diagnosis and an explanation as to how it was reached and the facts upon which it is based;

(2) A description of the defendant's mental or physical disability, if any; its severity; and an opinion as to whether and to what extent it impairs the defendant's ability to understand the nature and purpose of the proceedings against him or to assist in his defense, or both." 725 ILCS 5/104—15(a) (West 1992).

Two reports were filed by Dr. Thampy. The first, dated January 25, 1991, said, in full:

"Pursuant to Your Honor's Order, the undersigned psychiatrist examined the above defendant on January 22, 1991.

Based on the above examination, it is my opinion that this defendant is mentally *FIT* to stand trial. He understands the nature of the charge, the purpose of the proceedings, and is able to cooperate with counsel in his own defense.

No opinion regarding sanity. Medical records have been requested." (Emphasis in original.)

Apparently, the records arrived. On February 19, 1991, Dr. Thampy filed a report that said, in full:

"Pursuant to Your Honor's Order, the undersigned psychiatrist examined the above defendant on February 19, 1991.

Based on the above examination, it is my opinion that this previously adjudicated incompetent defendant is now *MENTALLY FIT FOR TRIAL, WITH MEDICATION.* He understands the nature of the charge pending against him, the purpose of the proceedings, and is able to cooperate with counsel in his own defense.

It is my opinion that this defendant was legally *SANE* at the time of the alleged offense. He was able to appreciate the criminality of his act and was able to conform his conduct to the requirements of the law." (Emphasis in original.)

The case was called on March 18, 1991. The trial judge noted receipt of the report. He said: "We have a report from the Psychiatric Institute indicating that the defendant has been found fit, *with medication.*" (Emphasis added.)

The defendant's lawyer then asked for a continuance, saying that although the defendant had been found sane, "I do think that his mental condition at the time will still be relevant, *as well as the fact that he's under medication now.*" (Emphasis added.)

The defendant's lawyer did not ask for a fitness hearing.

The judge set the case for trial.

## EVIDENCE AT TRIAL

Because of our disposition of this case, a detailed recitation of the facts is not necessary.

On October 25, 1990, at 2:34 a.m., Officer John Anderson and his partner responded to a call regarding a stabbing. They were directed to the eighth floor of the building at 1062 W. Bryn Mawr. As they climbed the stairs, they discovered Joyce Raymond lying on the landing between the fifth and sixth floors, apparently dead from stab wounds.

After calling for an ambulance, the officers continued up the stairs. They found the defendant lying on a small ledge or platform above the eighth-floor railing. When he was apprehended, he said: "I stabbed her."

Two witnesses testified to seeing the defendant stab Joyce Raymond in the stomach in the hallway outside the defendant's apartment. One was Louis Raymond, Joyce's son, then 12 years old. The other was Louis' cousin, Antonio Alexander.

Louis said the stabbing took place after they knocked on the defendant's door. The defendant, he said, pulled Antonio inside the apartment, where Antonio began screaming. Minutes later, Antonio ran out of the apartment, bleeding.

Antonio corroborated his cousin's testimony. He said the defendant pulled him into the apartment, where the defendant stabbed him. When the defendant opened the apartment door, Antonio ran out, following Louis down the hall. Joyce ran, too, but was grabbed by the defendant, knocked to the ground, and stabbed.

A building resident, Fernando Corona, found Joyce leaning against the stairwell door, bleeding and moaning. The defendant was on the stairs above, holding a knife. The defendant told Corona he stabbed Joyce because she tried to break into his apartment. Then the defendant walked down the stairs, kicked Joyce in the stomach, and said: "Let her bleed to death."

A bloody knife was recovered from the defendant's apartment.

The defendant testified. He said he was awakened by people knocking at his door. These people, he said, eventually broke into his apartment. He admitted cutting Antonio with a knife and stabbing Joyce, but said he did so in self-defense and because he believed they were going to rob him.

The jury convicted the defendant of the first-degree murder of Joyce Raymond, but found him not guilty of the aggravated battery of Antonio Alexander.

## PROCEEDINGS AFTER TRIAL

Before sentencing, a presentence report was prepared by the probation department. Under "Criminal History," the report said:

> "He is currently on medication for depression, and he was once termed unfit for trial."

In the "Mental Health History" section of the report, the trial judge was told:

"Mr. Guttierez advised the probation officer that he was hospitalized at the mental health units at Chicago Ridge Hospital in 1982 and 1988 and the University of Chicago in 1990. He said that he spent about a week on each visit to these hospitals. He said that he was hospitalized because he would get depressed and for doing things like going into the streets without any clothes. Mr. Guttierez said that he is currently on psychotropic medication and added that he has had a Behavioral Clinic Examination since being incarcerated on the present charge."

At the sentencing hearing, the defendant's lawyer said that while the defendant was found fit to stand trial, "it's interesting to note that there was a condition placed on that finding to the effect that he is fit with medication." Again, the defense lawyer did not ask for a fitness hearing.

The judge sentenced the defendant to 50 years.

OPINION

Convicting a person who is unfit to stand trial violates due process. (*Pate v. Robinson* (1966), 383 U.S. 375, 378, 15 L. Ed. 2d 815, 818, 86 S. Ct. 836, 838; *People v. Brandon* (1994), 162 Ill. 2d 450, 455-56, 643 N.E.2d 712.) It follows, then, that a State must provide adequate procedures to protect a defendant's right not to be tried while unfit. *Drope v. Missouri* (1975), 420 U.S. 162, 172, 43 L. Ed. 2d 103, 113, 95 S. Ct. 896, 904; *People v. Ralon* (1991), 211 Ill. App. 3d 927, 937, 570 N.E.2d 742.

This State has such procedures. They are set out in the Code of Criminal Procedure (725 ILCS 5/104—10 *et seq.* (West 1992)). Under the statutory plan, the trial judge has the duty to order a fitness hearing when either of two circumstances exists.

The first is contained in section 104—11(a). Once facts are brought to the attention of the trial court, either from observation of the defendant or by suggestion of counsel which raise a *bona fide* doubt of the defendant's fitness to stand trial, the court has a duty to hold a fitness hearing. (*People v. Murphy* (1978), 72 Ill. 2d 421, 381 N.E.2d 677.) Whether a *bona fide* doubt has been raised "is a decision resting within the discretion of the trial court since it is in a better position to observe and evaluate defendant's conduct." *People v. George* (1993), 263 Ill. App. 3d 968, 980, 636 N.E.2d 682; *People v. Bivins* (1981), 97 Ill. App. 3d 386, 388-89, 422 N.E.2d 1044.

The second way to trigger the court's duty to order a fitness hearing is contained in section 104—21(a). That section provides, in part:

"A defendant who is receiving psychotropic drugs or other medication under medical direction is entitled to a hearing on the issue of fitness while under medication." 725 ILCS 5/104—21(a) (West 1992).

The supreme court's reading of section 104—21(a) in *People v. Brandon* (1994), 162 Ill. 2d 450, 643 N.E.2d 712, determines the outcome of this case.

*Brandon* holds that the statute is clear and unambiguous. It must be enforced as enacted. The decision to hold a hearing under section 104—21(a) is not a matter for the court's discretion. It is a matter of right. It cannot be waived by counsel's failure to raise the provisions of section 104—21(a) in the trial court.

In *Brandon*, the trial judge did not know before or during the trial that the defendant was being treated with psychotropic drugs. He found out for the first time at the sentencing hearing. The defendant's lawyers had asked for a fitness hearing before trial for other reasons. They knew about the medication, but never told the trial judge until the sentencing hearing took place. Section 104—21(a) never was mentioned by anyone in the trial court.

The supreme court, with three judges dissenting, held that the defense lawyers' failure to assert the provisions of section 104—21(a) amounted to a denial of the effective assistance of counsel. If the defense lawyers had made the proper request, said the court, the judge would have been required to conduct the fitness hearing. Brandon's capital murder conviction was reversed and remanded for a new trial.

In the case before us, the defense lawyer, the prosecutor, and the trial judge knew the defendant was receiving psychotropic medication before, during, and after the trial.

Dr. Thampy's February 19, 1991, report said the defendant was "now mentally fit for trial, with medication." Both the judge and defense counsel made comments about the medication. The judge also knew the defendant once before had been adjudicated incompetent.

No one mentioned section 104—21(a). No one posed any questions about the nature of the medication or the reason for it. In this appeal, the State does not dispute the fact that the defendant was receiving psychotropic drugs under medical direction.

The behavior clinic reports should have spurred further inquiry. They were conclusory. They did not explain how the doctor's findings were reached and upon what facts they were based, violating the requirements of section 104—15(a)(1). We have said:

"When the circuit court in the proper exercise of its discretion orders a psychiatric examination of defendant, it undertakes a concomitant duty to insure that the resultant report fulfills the requirements of section 104—15(a). Otherwise, the purpose of the statute would be defeated and the substance of the examiner's recommendations would not be amenable to independent judicial scrutiny." *People v. Harris* (1983), 113 Ill. App. 3d 663, 669, 447 N.E.2d 941.

Despite the conclusory nature of the reports, they were sufficient to trigger the duty to conduct a fitness hearing. By enacting section 104—21(a), "the legislature intended that where a trial court has advance notice of such medication, a hearing is mandatory to determine fitness before the case proceeds." *People v. Ralon* (1991), 211 Ill. App. 3d 927, 938, 570 N.E.2d 742.

After conviction, the presentence report reminded the trial judge that the defendant "is currently on medication for depression, and he was once termed unfit for trial." Again, no one raised the issue of fitness.

The defendant was denied effective assistance of counsel when his lawyer, before trial, failed to ask the trial court for a fitness hearing under section 104—21(a). (*Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052; *People v. Brandon* (1994), 162 Ill. 2d 450, 458, 643 N.E.2d 712.) Here, as in *Brandon,* the prejudice is manifest. The defendant did not receive the fitness hearing he was "entitled to" under the statute. It was a matter of right.

The responsibility must be shared. When the trial judge learned the defendant was fit for trial "with medication," further inquiry was mandatory. After the judge heard testimony about the nature and purpose of the medication, "a fitness hearing would have been automatic." (*Brandon,* 162 Ill. 2d at 459.) The judge's failure to recognize and enforce the provisions of section 104—21 was reversible error.

Like the majority in *Brandon,* we do not speculate about the probable outcome of the fitness hearing. The issue is whether it should have been conducted. Clearly, it should have been.

Regrettably, we cannot turn back the clock to that moment when the February 19, 1991, behavior clinic report was examined in open court. The only remedy authorized by the applicable decisions is reversal and remand for further proceedings consistent with this opinion. See *People v. Murphy* (1987), 160 Ill. App. 3d 781, 795-96, 513 N.E.2d 904.

Other issues were raised by the defendant in this appeal, but there is no need to discuss them. We note that the evidence at trial was sufficient to support the jury's verdict.

Reversed and remanded.

CAMPBELL, P.J., and BRADEN, J., concur.